JOHNNY DARNELL GRIGGS (SBN 110640)
  *jgriggs@zuberlaw.com*
**ZUBER LAWLER & DEL DUCA LLP**
777 S. Figueroa Street, 37th Floor
Los Angeles, California 90017
Telephone: (213) 596-5620
Facsimile: (213) 596-5621

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR BUTTE COMMUNITY BANK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE COMPANY AS RECEIVER FOR BUTTE COMMUNITY BANK,<br><br>            Plaintiff,<br><br>    v.<br><br>ROBERT CHING, EUGENE EVEN, DONALD LEFORCE, ELLIS MATTHEWS, LUTHER McLAUGHLIN, ROBERT MORGAN, JAMES RICKARDS, GARY STRAUSS, HUBERT TOWNSHEND, JOHN COGER AND KEITH ROBBINS,<br><br>            Defendants. | CASE NO.<br><br>**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, BREACH OF FIDUCIARY DUTIES**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Butte Community Bank, Chico, California ("FDIC-R"), for its Complaint, states as follows:

## I.    INTRODUCTION

1.    The FDIC-R brings this case in its capacity as Receiver for Butte

1   Community Bank, Chico, California (the "Bank"), pursuant to authority granted by

2   12 U.S.C. §1821.

3   2.   On August 20, 2010, the Bank was closed by the California Department

4   of Financial Institutions ("CDFI") and the FDIC was named as receiver.

5   3.   Pursuant to 12 U.S.C. §1821(d)(2)(A), by operation of law, the FDIC

6   has succeeded to all rights, titles, powers, and privileges of the Bank and of any

7   stockholder, member, accountholder, depositor, and other creditor of the Bank.

8   Those rights include, but are not limited to, the pursuit of claims against the Bank's

9   former officers and directors.

10   4.   The FDIC-R seeks to recover losses of at least $8.8 million the Bank

11   suffered because Defendants — eleven of its former directors and/or executive

12   officers — negligently, grossly negligently, and in breach of their fiduciary duties

13   failed to maintain adequate capitalization of the Bank, improperly caused the Bank

14   to transfer funds and property to its holding company, failed to direct the business

15   and affairs of the Bank to insure safe, sound and prudent principles of banking, and

16   caused or contributed to an unwarranted depletion of capital, all as the result of a

17   May 2008 dividend (the "Dividend"), partially funded by a sale-leaseback

18   transaction involving seven of the Bank's branch buildings (the "Sale-Leaseback"),

19   that was used to repurchase 13 million shares of Bank holding company stock from

20   the Defendants and others (the "Tender Offer").

21   **II.   THE PARTIES**

22   **A.   PLAINTIFF**

23   5.   On August 20, 2010, Plaintiff FDIC-R was appointed Receiver for the

24   Bank by the CDFI.   The Bank was wholly owned by Community Valley Bancorp, a

25   California corporation ("CVB").

26   **B.   DEFENDANTS**

27   6.   Defendant JOHN COGER ("Coger") served the Bank and CVB in

28   various capacities during his tenure.   He was a Director of the Bank from September

21, 2004 until the Bank failed, Chief Financial Officer ("CFO") through December 2009, and the Bank's President from April 17, 2007 until the Bank failed.   In addition, Coger served as a Director of CVB from its formation in July 2001 until the Bank's failure in 2010.   In addition, he served as CVB's Executive Vice President, CFO, and Chief Operating Officer ("COO") from CVB's formation until Keith Robbins retired in January 2010.   Thereafter, Coger served as CVB's President and CEO.

7.   Defendant KEITH ROBBINS ("Robbins") served the Bank and CVB in various capacities during his tenure.   He was a Director of the Bank and the Bank's Chief Executive Officer ("CEO") until he retired in January 2010.   In addition, Robbins also served a Director of CVB.   Robbins also served as CVB's President and CEO from CVB's formation until he retired on January 27, 2010.

8.   Defendant ROBERT CHING ("Ching") served as a Director of the Bank from May 1990 through June 2010.   He also served as a Director of CVB from July 2001 through June 2010.

9.   Defendant EUGENE EVEN ("Even") served as a Director of the Bank from May 1990 through August 2010.   He also served as a Director of CVB from July 2001 through August 2010.

10.   Defendant DONALD LEFORCE ("Leforce") served as a Director of the Bank from August 1990 through August 2010.   Leforce was also Chairman of the Bank's Board from the time of the Bank's formation until its closure.   In addition, he served as a Director of CVB from July 2001 through August 2010.

11.   Defendant ELLIS MATTHEWS ("Matthews") served as a Director of the Bank from May 1990 through August 2010.   He also served as a Director of CVB from July 2001 through August 2010.

12.   Defendant LUTHER McLAUGHLIN ("McLaughlin") served as a Director of the Bank from May 2006 through August 2010.   He also served as a Director of CVB from May 2006 through August 2010.

13.   ROBERT MORGAN ("Morgan") served as a Director of the Bank from May 1990 through August 2010.  He also served as a Director of CVB from July 2001 through August 2010.

14.   Defendant JAMES RICKARDS ("Rickards") served as a Director of the Bank from May 1990 through August 2010.  He also served as a Director of CVB from July 2001 through August 2010.

15.   Defendant GARY STRAUSS ("Strauss") served as a Director of the Bank from May 1990 through June 2010.  He also served as a Director of CVB from July 2001 through June 2010.

16.   Defendant HUBERT TOWNSHEND ("Townshend") served as a Director of the Bank from May 1990 through June 2010.  He also served as a Director of CVB from July 2001 through June 2010.

## III.   <u>JURISDICTION AND VENUE</u>

17.   The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq.; 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC-R has power to bring suit in any court of law.  12 U.S.C. § 1819. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

18.   This Court has personal jurisdiction over Defendants who are residents of the State of California and/or who at all times conducted the business of the Bank in the State of California.

19.   This Court has personal jurisdiction over each of the Defendants named in this action pursuant to California Code of Civil Procedure § 410.10.

20.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the claims and causes of action asserted in this Complaint arose in this District.

/ / /

## IV.   BACKGROUND

### A.   The Bank

21.   The Bank was incorporated under the laws of the State of California on May 11, 1990 and commenced operations as a California state-chartered commercial bank on December 14, 1990. At the time of its closure, the Bank's administrative office was located in Chico, California.

22.   The Bank was an insured institution under the Federal Deposit Insurance Act and participated in the separate FDIC Transaction Account Guarantee Program. Under that program, all noninterest-bearing transaction accounts were fully guaranteed by the FDIC. The Bank was not a member of the Federal Reserve System.

23.   At December 31, 2009, the Bank had approximately $532.3 million in assets, $434.1 million in loans and $500.1 million in deposits.

24.   At the time of its closure on August 20, 2010, the Bank operated 14 branches, which included seven full-service branch offices in four Butte County communities, one full-service branch office in Sutter County, two full-service branches in Tehama County, one full-service branch in Yuba County, one full-service branch in Colusa County, and two full-service branches in Shasta County.

### B.   The Holding Company

25.   At all times relevant to this action, the Bank was a wholly-owned subsidiary of CVB. CVB was (and is) a California corporation registered as a financial holding company under the Bank Holding Company Act of 1956, as amended, and is headquartered in Chico, California.

26.   CVB was incorporated in July 2001 and acquired all of the outstanding shares of the Bank in May 2002. CVB was publicly-traded on NASDAQ with the ticker symbol CVLL.OB until it was de-listed in September 2009. CVB existed primarily for the purpose of holding the stock of the Bank and of such other subsidiaries as it may have acquired or established. Over the course of its existence,

1  CVB's primary source of income was dividends from the Bank.

2  **C.   The Directors and Relevant Officers**

3  **1.   The Bank's Directors and Relevant Officers**

4  27.   Throughout its history, the Bank was governed by a 13-member Board

5  of Directors.  Over the course of its existence, the Bank's Board experienced very

6  little turnover.  Of the nine Defendant Board members who were not Bank officers,

7  all but one of them were members of the Bank's Board over substantially the entire

8  period of the Bank's existence.  Those Board members included Robert Ching,

9  Eugene Even, Donald Leforce (who was also Chairman of the Bank's Board from

10  the time of the Bank's formation until its closure), Ellis Matthews, Robert Morgan,

11  James Rickards, Gary Strauss, and Hubert Townshend.  Luther McLaughlin (whose

12  tenure was slightly more than four years) had the shortest tenure among the non-

13  officer Board members.[1]

14  28.   Two Defendants were both members of the Bank's Board as well as

15  officers of the Bank.  Keith Robbins was a director of the Bank from its formation

16  on May 11, 1990, until the Bank failed.  John Coger was a director of the Bank from

17  September 21, 2004, until the Bank failed.

18  **2.   CVB's Directors and Relevant Officers**

19  29.   From the time of CVB's formation in July 2001 until the Bank's failure

20  in August 2010, the Board of Directors of CVB was identical to the Bank's Board.

21  In addition, Mr. Robbins and Mr. Coger both served as officers of CVB, in addition

22  to being officers of the Bank.

23  / / /

24  / / /

25  _____

26  [1] Two of the Bank's non-officer directors are not Defendants in this action.  They are:  (1) Charles Mathews, who

27  joined the Bank's Board in April 2004 and resigned in February 2009; and (2) the late John Lanam ("Lanam"), who
    passed away on September 11, 2010, and who was a director of the Bank from its formation until the Bank failed.

28

# V.   FACTUAL ALLEGATIONS

## A.   Defendants Approved the Dividend and Sale-Leaseback to Support the Tender Offer

30.   Before 2007, the Bank had developed an overconcentration of lending in real estate, particularly for construction and development ("C&D") projects. In the first six months of 2006, the percentage of real estate loans to Tier 1 capital ranged from 643 percent to 665 percent against a target of 450 percent. Through August 2006, the percentage of C & D loans to Tier 1 capital ranged from 653 percent to 719 percent against a target of 600 percent.

31.   By 2007, this overconcentration was threatening to cause significant losses to the Bank. From 2006 to 2007, the Bank's net income declined 32 percent from $8.6 million to $6 million after construction in the Bank's local real-estate market dramatically declined. During the same period, the Bank's adversely classified assets increased 1,200 percent, from $2 million to $26 million.

32.   Recognizing the Bank's significant deterioration in asset quality and the limits on its ability to grow in a declining market, Defendants began to pursue a strategy to strip capital from the Bank, with primary focus on a stock buyback. In mid-2007, Defendants consulted, on a preliminary basis, with Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), regarding stock buyback options. As a result, Sandler O'Neill structured, for the Directors' and Officers' consideration and based on financial information provided by the Bank, a multi-year stock buyback program ("Sandler O'Neill Stock Buyback Scenario").

33.   Under the Sandler O'Neill Stock Buyback Scenario, CVB would have purchased approximately 1.186 million of its shares in the open market over a period of 5 years. The transaction structured by Sandler O'Neill was fundamentally different from the stock buyback ultimately consummated by the Bank discussed below, in that the Sandler O'Neill Stock Buyback Scenario: (1) did not involve a tender offer; and (2) did not involve the purchase of one million CVB shares at one

time.  Moreover, because the Sandler O'Neill Stock Buyback Scenario would have been executed gradually and over a 5-year period, the transaction would have allowed the Bank and CVB more flexibility to adapt to changing circumstances.

34.   Defendants rejected the Sandler O'Neill Stock Buyback Scenario as too conservative.   They declined to retain or consult further with Sandler O'Neill regarding the advisability of potential stock buyback scenarios, nor did they retain any other financial consultant with respect to these matters.   Instead, they independently decided to engage in a large one-time "tender offer" that would maximize the amount of cash transferred from the Bank to stockholders.  Under this plan, the Bank would raise cash by selling seven Bank buildings (which it would then immediately lease back).  That cash, together with other cash on hand, would then be transferred to CVB in the form of a dividend, and CVB would then distribute the cash to participating CVB stockholders in a tender offer.  Defendants originally planned to cause this distribution in the fourth quarter of 2007.

35.   Ostensibly because of a data security breach that occurred at the Bank in late 2007, Defendants did not move forward with the Tender Offer as they had planned.  CVB's stock price declined 20 percent during the last half of 2007 from $12.59 per share on June 30, 2007, to $10.08 per share on December 31, 2007.

36.   On information and belief,  on January 15, 2008, Defendants decided to move forward with the Sale-Leaseback, Dividend, and Tender Offer, with only one director (non-defendant Charlie Matthews) dissenting.  In a January 15, 2008 email, CEO Robbins informed the Bank's lawyer that the board approved these transactions.   Because the decision was made in executive session, the Bank's secretary (Gayle Lee, who was not a director), failed to report it in the minutes. When Lee realized the omission, she prepared backdated minutes to reflect the decision.

37.   On February 14, 2008, the Bank closed the Sale-Leaseback, selling each of the seven buildings to a separate limited liability company owned by Shasta

Real Estate Holdings, LLC.   On March 13, 2008, CVB issued the $13 million Tender Offer to its stockholders.   On May 5, 2008, the Bank paid CVB the Dividend, in the amount of $8.8 million, and three days later, CVB paid a total of $13 million (the Dividend in the amount of $8.8 million from the Bank plus $4.2 million CVB had retained from prior Bank dividends) to participating CVB stockholders.

38.   As set forth in more detail below, the Dividend constituted willful misconduct, negligent, or grossly negligent behavior by the Defendants.   At worst, the Defendants were acting in their own self-interest when they depleted the Bank's much-needed capital by declaring the Dividend and consummating the Tender Offer.   At best, the Defendants engaged in these transactions at a time when, and under circumstances where, those transactions were so imprudent and ill-advised, that executing them constituted negligence or gross negligence.

**B.      The Defendants Benefitted Personally from the Tender Offer**

39.   The Defendants owned a significant portion of the stock to be purchased in the Tender Offer.   At the time of the Tender Offer, 7,662,715 shares of CVB common stock were outstanding.   In addition, CVB had reserved 476,921 shares for issuance upon exercise of outstanding stock options.   Members of the Bank's Board of Directors beneficially owned an aggregate of 2,120,164 shares of CVB's outstanding stock (including 144,292 shares that could have been acquired by then-currently exercisable options).

40.   Nine of the Defendants participated personally in the Tender Offer, tendering large numbers of shares.   Collectively, the Bank's Directors received approximately $3.721 million of the nearly $13 million (almost 29 percent) of the proceeds related to the Tender Offer.   The chart below sets forth the distribution of the $3.721 million in proceeds among the Bank's Directors:

/ / /

/ / /

| DIRECTOR | NUMBER OF SHARES SOLD | CASH RECEIVED |
|---|---|---|
| Donald Leforce | 12,676 | $164,788 |
| Robert Ching, MD | 70,889 | $921,557 |
| Eugene Even | 12,704 | $165,152 |
| John Lanam | 19,014 | $247,182 |
| Charles Mathews | 0 | $0 |
| Ellis Mathews | 3,676 | $47,788 |
| Luther McLaughlin | 0 | $0 |
| Robert Morgan, MD | 46,849 | $609,037 |
| James Rickards | 0 | $0 |
| Gary Strauss, MD | 28,522 | $370,786 |
| Hubert Townshend, JR | 15,845 | $205,985 |
| Keith Robbins | 47,537 | $617,981 |
| John Coger | 28,522 | $370,786 |
| **Total** | **286,234** | **$3,721,042** |
| **Ratio of Total Shares Sold/Percentage of Total Proceeds** | **28.6 percent** | |

41.     Excluding 19,014 shares sold by the late John Lanam at a price of $247,182, the Defendants received collectively approximately $3.474 million from the Tender Offer, nearly 27 percent of the proceeds.

42.     Although McLaughlin and Rickards ultimately decided not to participate in the Tender Offer, they were nonetheless personally interested in the transactions at the time they voted to approve them, because they had the opportunity to participate in the Tender Offer and because the reduction of number of shares of CVB was expected to have inflationary pressures on the remaining stock held by Defendants.

**C.     Shares are Purchased at Inflated Prices in the Tender Offer**

43.     The price at which CVB shares were sold pursuant to the Tender Offer was significantly higher than the price at which CVB shares were sold on the open market.  The Tender Offer price was $13 per share, contrasted with an open market

1  trading price generally ranging between $9.50 and $10 during the three months

2  preceding the Tender Offer announcement.

3      44.    Shortly before the Defendants decided to move forward with the

4  Tender Offer, the investment banker retained to provide a fairness opinion was

5  concerned that the price of $13 per share was too high.  In a January 31, 2008 email

6  to Officer/Director Defendant Robbins, the investment banker opined that "$13.00

7  or approx. 2x book (number you used in your analysis) is a stretch given the current

8  market for bank stocks" and that "[He] would be in the $11.50 neighborhood."

9      45.    At no time following the decision of the Defendants to proceed with the

10 Tender Offer did the price of CVB shares approach $13 per share.  During and

11 subsequent to the Tender Offer, the month-end stock prices on the open market

12 were: March 2008 - $11.87; April 2008 - $11.13; May 2008 - $8.62; June 2008 -

13 $6.68.  On May 8, 2008, the date Defendants and the other stockholders sold one

14 million shares at $13 per share, the publicly traded price of the stock was $9.99 per

15 share.

16     **D.    Defendants were Aware of the Bank's Declining Financial Position**

17         **at the Time of the Dividend**

18     46.    Adversely classified items had increased to $25,994,000 as of

19 September 30, 2007 compared to $1,900,000 on September 30, 2006.  Therefore, the

20 Board of Directors had notice that asset quality was deteriorating well in advance of

21 the Sale-Leaseback, Dividend, and Tender Offer.  Adversely classified assets

22 subsequently increased to $71,214,000 as of September 30, 2008.   In addition, the

23 Bank's profits were in a steep nosedive during this period.  The Bank's net income

24 declined from $6.459 million in 2007, to $2.739 million in 2008, and to a $27.508

25 million loss in 2009.

26     47.    Defendants were fully aware of the decline in the Bank's financial

27 condition.  Among other things, the minutes of the meeting of the Bank's Board of

28 Directors held on February 19, 2008 reveals that the Bank's Board of Directors

voted to approve a budget that adjusted the Bank's net income for Fiscal Year 2008 downward by $571,000.   In addition, by February 19, 2008, regulators had communicated to the Bank's Board of Directors that "A downturn in the real estate market has adversely affected the overall condition of the bank" and that "future earnings prospects look less favorable compared to the strong results of previous years."

48.   Notwithstanding that Defendants had ample notice of the precipitous decline in the Bank's financial condition between the fourth quarter of 2007  and the consummation of the transaction during the second quarter of 2008, and notwithstanding the fact that they recognized the need to revise the Bank's projection of net profits downward by nearly $600,000, Defendants failed and/or refused to reevaluate the Sale-Leaseback, the Dividends, or the Tender Offer, in light of these rapidly changing circumstances.

49.   Moreover, the Bank had, over a significant period of time, been heavily and excessively concentrated in real estate loans.  Minutes of the Bank's Loan Committee meetings in October, November and December 2007 demonstrate that Defendants were aware of the decline in real estate values and loan quality well before their decision to proceed with the Dividend.

50.   Defendants had ample, compelling and irrefutable evidence that the Bank's financial condition was worsening rapidly and profoundly.  In light of that deterioration, an ordinary prudent person under like circumstances would have concluded that the Bank needed to preserve its capital in order to withstand worsening financial conditions.  Despite this knowledge, and in an apparent attempt to salvage, and even enhance, the return on their personal investments in CVB, Defendants chose to proceed with the ill-advised Sale-Leaseback, Dividend, and Tender Offer, rather than maintain a strong capital level as a hedge against expected real estate loan losses and the Bank's deteriorating financial condition.

/ / /

**E.      The Dividend Was Consummated at a Time When Defendants Knew That the Bank was Vulnerable Due to Over Concentration of Real Estate Loans**

51.      During the time when the Defendants depleted the capital of the Bank by consummating the Tender Offer and the Dividend, Defendants knew that the Bank was particularly vulnerable due to lack of diversification of its loan portfolio. In a declining real estate market, the Bank's loan portfolio was greatly over-concentrated in commercial real estate ("CRE") loans, as well as acquisition, development and construction ("ADC") loans.

52.      Over many years prior to the Bank's closure, the Defendants were apprised that the Bank's real estate loan portfolio, and particularly the construction and development loan portfolios, greatly exceeded targets established by the Bank and the FDIC.   Concentration levels in real estate loans were reported to the Bank's Board of Directors each month beginning as far back as 2002.   Each month, the minutes included a section titled "Loan Reports," which recapped the loan data presented for that meeting.   The section included comments regarding the concentration level of real estate loans as a percentage of capital.   Notwithstanding that the specific measurements evolved over time, the measurements utilized consistently demonstrated that real estate loans exceeded the established targets, usually by a wide margin.

53.      Beginning in 2006, the regulatory agencies began to criticize the real estate concentration levels of the Bank.   Notwithstanding this criticism, Defendants failed or declined to demand that management adjust the Bank's lending patterns and strategic direction, thereby causing the Bank to experience significant losses related to the CRE and ADC loan portfolios.   Notwithstanding their knowledge that the Bank was vulnerable and its financial position precarious due to its excessive concentration in real estate loans, Defendants chose to deplete the Bank's capital  by consummating the Dividend.

**F.     Defendants' Justification for the Dividend and Tender Offer was False and Pretextual**

54.    In order to justify the significant and unwarranted depletion of the Bank's capital (and the transfer of a significant percentage of that capital into their own pockets), Defendants offered the following false and pretextual rationale:  (1) that it was not likely that the Bank could grow at the same level as in the past; (2) that the Bank had "excess capital" that could not effectively be utilized to grow the Bank's business; (3) that the market for CVB stock was "thin"; and (4) that the Board determined that the best use of that capital was to return it to stockholders in the form of an issuer tender offer.

55.    Defendants' articulated fundamental premise (i.e., that the Bank had excess capital, the highest and best use of which was to return it to shareholders) was false and pretextual.  That the Bank needed cash at the time of the Dividend is shown by CVB's issuance  of $8 million in trust preferred securities in July 2007, at the same time they were considering the Tender Offer.  In addition, on September 19, 2007, Howe Barnes Hoefer & Arnett, Inc., an investment banker, warned Defendants that the Dividend would cause a sufficient decline in the Bank's Risk-Based Capital Ratio so as to cause the Bank to be classified as less than well-capitalized.  Defendants' internal documents establish that they were prepared to go forward with the Dividend despite the effect on the Bank's regulatory capital. Indeed, in June 2008, one month after consummation of the Dividend and Tender Offer, CVB was forced to apply for and receive a $4 million letter of credit from Pacific Coast Bankers' Bank.   On information and belief, the purpose of the borrowing was to prevent the Bank from being classified as less than well-capitalized, which would limit its ability to accept brokered deposits. CVB was forced to pledge 100 percent of the Bank's shares to secure the letter of credit.

**G.     The Sale-Leaseback is Further Evidence of Pretext**

56.     Defendants mistakenly assumed that the cash infusion from the Sale-

14

1  Leaseback would disguise the depletion of capital caused by the Dividend

2      57.    After the Sale-Leaseback was completed on February 14, 2008, the

3  Bank's accountants reminded Bank officers that the Bank was required to amortize

4  the gain over the fifteen-year life of the leases rather than recognize it as income

5  immediately, meaning the Bank could not disguise the effect on capital of the

6  Dividend.  Defendants nonetheless proceeded with the Dividend, despite knowing

7  the adverse effect it would have on the Bank's regulatory capital.

8      **H.**    **The Dividend Violated the Bank's Dividend Policy and the**

9             **Federal Reserve Board Policy**

10      58.    The Bank's policies governing the approval and funding of dividends

11  during the relevant time period are contained in the Bank's Asset/Liability

12  Management Policy ("Asset Policy") and Cash Dividend Approval Policy ("Cash

13  Dividend Policy").  Under each of the policies, only the Bank's Board of Directors,

14  by a majority vote, had the authority to approve dividends.

15      59.    Under the Cash Dividend Policy, dividends could not impair the safety,

16  soundness, or future growth plans of the Bank, and must fall within legal and

17  regulatory guidelines, including state and FRB limitations. Pursuant to the FRB

18  Policy Statement, *Cash Dividends Not Fully Covered by Earnings* (Nov. 14, 1985),

19  dividends are inappropriate if they are greater than a bank's available net income

20  over the past year, or are based solely or largely upon gains resulting from unusual

21  or nonrecurring events (e.g., the sale of bank buildings), if the funds could be better

22  used to strengthen the bank's financial condition.  The Dividend violated each of

23  these restrictions.

24      60.    Moreover, the Dividend violated both the Asset Policy and the Cash

25  Dividend Policy because the Dividend at issue was not based on current and

26  projected growth and because it impaired future growth. Defendants were aware that

27  the Bank's earnings were declining and its impaired assets were growing because,

28  among other things, Defendants signed CVB's 2007 Form 10-K the day the Tender

Offer commenced, acknowledging that the Bank was "particularly susceptible" to the adverse economic conditions affecting its lending area and its income had declined 10 percent from the prior year.  Moreover, the CDFI had warned the Bank in February 19, 2008, that the economic downturn would adversely affect Butte's future earnings.  Defendants were well aware of the deteriorating economic conditions and that, in all likelihood, that the Bank's growth would continue be negatively impacted. Nevertheless, Defendants approved and funded the Dividend.

## I.   Defendants' Actions Constituted Negligence, Gross Negligence and/or Willful Misconduct

61.   Defendants were negligent, grossly negligent and/or engaged in willful misconduct by declaring the Dividend (in order to consummate the ill-conceived Tender Offer) at a time when the real estate market (in which the Bank was heavily concentrated) was softening, the Bank's profits were declining precipitously, and its adversely-classified assets were skyrocketing.  Moreover, the Dividend violated applicable dividend policies promulgated by the Bank and regulatory authorities.

62.   The Bank's need to preserve its capital was obvious and compelling. Instead of preserving the Bank's capital, Defendants opted to deplete the Bank's capital to below acceptable levels, under conditions wherein the Bank's financial condition was declining markedly.  The motive for this perplexing decision is clear: heavily invested in the stock of CVB, and faced with the prospect of losing the value of that investment, Defendants implemented a strategy to not only recoup their investment, but to do so at a significant premium above the market price for CVB's shares.

63.   The actions of the Defendants as alleged herein were willful, grossly negligent, and/or negligent, and were a significant factor in the Bank's failure. Among other things, Defendants:

(a)   abdicated their corporate responsibilities, in that, among other things: (i) Defendants chose to turn a blind eye to the declining financial condition

of the Bank in their consideration of the Dividend; and (ii) Defendants declined or refused to make any reasonable inquiry as to the effect of the Dividend on the Bank's capital;

(b)     were personally interested in the transaction and/or had a conflict of interest, in that, by approving the Dividend, Sale-Leaseback, and Tender Offer, Defendants created an opportunity for themselves to (and in all instances save two, did in fact) line their pockets by selling back more than 267,000 shares of CVB stock at significantly inflated prices;

(c)     engaged in bad faith conduct and/or had improper motives, in that, among other things: (i) they approved the Dividend for the purpose of benefitting themselves and to the detriment of the Bank; (ii) created an elaborate pretext to justify the Tender Offer and the Dividend, when in fact, they knew or should have known that the manufactured justification was false; (iii) knowingly depleted Bank's capital below its capitalization thresholds by approving the Dividend; (iv) attempted to disguise or forestall the Bank's shortfall in capital created by the Dividend, by, among other things, causing the Bank to consummate the Sale-Leaseback, and or incur additional debt; and (v) violated the Bank's Dividend Policy and the Federal Reserve Board Policy by approving the Dividend.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF —NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

64.     Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 64 of this Complaint, as though fully set forth herein.

65.     As directors of the Bank, Defendants were required to perform their duties with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstance.  Those duties included, but were not limited to, the following:

a.   To maintain adequate capitalization of the Bank, and to avoid depleting the Bank's reserves so as to cause the Bank to be undercapitalized;

b.   To avoid self-dealing and other conflicts of interest;

c.   To fully inform themselves regarding the risks of particular transactions prior to approving those transactions, including obtaining sufficiently detailed, current and reliable information to allow them to make prudent decisions;

d.   To adopt such careful, reasonable and prudent policies and procedures as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures; and

e.   To ensure that any and all transactions complied with the principles of safe and sound banking practices.

66.   Defendants negligently failed to fulfill these duties and instead abdicated their responsibilities as Bank directors by, *inter alia*:

a.   depleting the Bank's capital reserves, so as to cause the Bank to be inadequately capitalized by, among other things approving the Dividend, thereby transferring more than $8.8 million to CVB: (i) at a time when the Bank's financial health was deteriorating precipitously, (ii) at a time when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining, and (iii) in violation of policies promulgated by the Bank and regulatory authorities;

b.   engaging in self-dealing and conflict of interest for their own benefit and to the detriment of the Bank,  by among other things,

1   approving the Dividend, thereby depleting the Bank's capital
2   reserves: (i) at a time when  the Bank's financial health was
3   deteriorating precipitously, (ii) at a time when  the Bank's
4   financial health was compromised by excessive concentration in
5   real estate lending at a time when the real estate market and the
6   national economy were declining, and (iii) in violation of
7   policies promulgated by the Bank and regulatory authorities;

8  c. failing to inform themselves regarding the risks of the Dividend
9   prior to approving it — even failing to take the most rudimentary
10   step of securing expert financial advice on the advisability of the
11   Dividend given the Bank's flagging financial outlook, as well as
12   worsening conditions in the national economy;

13  d. failing to follow any reasonable and prudent policies and
14   procedures relating to consideration and/or consummation of the
15   Dividend and Sale Leaseback, and instead (i) proceeding without
16   any expert financial advice or analysis regarding the effect of
17   these transactions on the Bank's financial condition, (ii) failing
18   to evaluate or consider available financial data when Defendants
19   approved the Dividend in 2008, (iii) structuring the Dividend in a
20   way that would deplete the Bank's capital and directly benefit
21   Defendants, (iv) approving the Dividend in violation of policies
22   promulgated by the Bank and regulatory authorities; and,

23  e. failing to ensure that the Dividend complied with  the  principles
24   of safe and sound banking practices, when the Bank's financial
25   health was compromised by excessive concentration in real
26   estate lending at a time when the local real estate market and the
27   national economy were declining.

28  67. As alleged more fully elsewhere in the Complaint, Defendants

negligently performed their duties by, among other things, unreasonably failing to investigate material facts; failing to use their business judgment in carrying out their responsibilities to the Bank by failing to act with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances; and failing to act in good faith, ignoring the danger their negligence was causing to the Bank.  These breaches of duty are exemplified by the Dividend transactions.

68.    The decisions made by Defendants as alleged throughout this Complaint were not good-faith business decisions made in an informed and deliberate manner, but involved transactions in which Defendants had a personal interest.

69.    As a direct and proximate result of Defendants' negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $8.8 million.  As a further and direct proximate result of Defendants' actions as alleged in this Complaint, the Bank failed, resulting in its closure on August 20, 2010. Consequently, the FDIC-R has suffered further damages, in an amount to be proven at trial.

70.    With respect to all of their actions and inactions alleged herein, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

## SECOND CLAIM FOR RELIEF — GROSS NEGLIGENCE
## UNDER 12 U.S.C. § 1821(k)
### (IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)

71.    Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 64 of this Complaint, as though fully set forth herein.

72.    Section 1821(k) of The Financial Institutions Reform, Recovery and Enforcement Act ("FIREEA") holds directors or officers of financial institutions

personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.   California law defines gross negligence as either a want of even scant care or an extreme departure from the ordinary standard of care.

73.   As directors and/or officers of the Bank, Defendants owed the Bank a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. This duty of care included, but was not limited to, the following:

    a.   To maintain adequate capitalization of the Bank, and to avoid depleting the Bank's reserves so as to cause the Bank to be undercapitalized;

    b.   To avoid self-dealing and other conflicts of interest;

    c.   To fully inform themselves regarding the risks of particular transactions prior to approving those transactions, including obtaining sufficiently detailed, current and reliable information to allow them to make prudent decisions;

    d.   To adopt such careful, reasonable and prudent policies and procedures as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures; and

    e.   To ensure that any transactions complied with the principles of safe and sound banking practices.

74.   Defendants, through their gross negligence, breached their duties of care by, among other things, failing to exercise even scant care or acting in a manner constituting an extreme departure from the ordinary standard of care by:

    a.   depleting the Bank's capital reserves, so as to cause the Bank to

be inadequately capitalized, by among other things: approving the Dividend, thereby transferring more than $8.8 million to CVB: (i) at a time when the Bank's financial health was deteriorating precipitously, (ii) at a time when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining, and (iii) in violation of policies promulgated by the Bank and regulatory authorities.

b. engaging in self-dealing and conflict of interest for their own benefit and to the detriment of the Bank,  by among other things, approving the Dividend, thereby depleting the Bank's capital reserves at a time: (i) when the Bank's financial health was deteriorating precipitously, (ii) when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining, and (iii) in violation of policies promulgated by the Bank and regulatory authorities;

c. failing to inform themselves regarding the risks of the Dividend prior to approving it — and even failing to take the most rudimentary step of securing expert financial advice on the advisability of the Dividend given the Bank's flagging financial outlook, as well as worsening conditions in the national economy;

d. failing to follow any reasonable and prudent policies and procedures relating to consideration and/or consummation of the Dividend, and instead (i) proceeding without any expert financial advice or analysis regarding the effect of this transaction on the Bank's financial condition, (ii) failing to evaluate or consider

available financial data when Defendants approved the Dividend in 2008,  (iii) structuring the Dividend transaction in a way that would deplete the Bank's capital and directly benefit Defendants, and (iv) approving the Dividend in violation of policies promulgated by the Bank and regulatory authorities; and

e.    failing to ensure that the Dividend transactions  complied with the principles of safe and sound banking practices, when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the local real estate market and the national economy were declining.

75.    Defendants were grossly negligent in that their manner of carrying out their duties and responsibilities to the Bank constituted a want of even scant care or an extreme departure from the ordinary standard of care, as further described throughout this Complaint.

76.    As a direct and proximate result of these Defendants' gross negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $8.8 million.  As a further and direct proximate result of Defendants' actions as alleged in this Complaint, the Bank failed, resulting in its closure on August 20, 2010. Consequently, the FDIC-R has suffered further damages, in an amount to be proven at trial.

77.    With respect to all of their actions and inactions alleged herein, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

### THIRD CLAIM FOR RELIEF — GROSS NEGLIGENCE UNDER CAL. CORP. CODE § 309

### (IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)

78.    Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 64 of this Complaint, as though fully set forth

herein.

79.     Under section 309(a) of the California Corporations Code, directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," which is defined under the California common law as either a want of even scant care or an extreme departure from the ordinary standard of care.

80.     As directors and/or officers of the Bank, Defendants owed the Bank a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. This duty of care included, but was not limited to, the following:

a.     To maintain adequate capitalization of the Bank, and to avoid depleting the Bank's reserves so as to cause the Bank to be undercapitalized;

b.     To avoid self-dealing and other conflicts of interest;

c.     To fully inform themselves regarding the risks of particular transactions prior to approving those transactions, including obtaining sufficiently detailed, current and reliable information to allow them to make prudent decisions;

d.     To adopt such careful, reasonable and prudent policies and procedures as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures; and

e.     To ensure that any transactions complied with the principles of safe and sound banking practices.

81.     Defendants, through their gross negligence, breached their duties of care by, among other things, failing to exercise even scant care or acting in a manner

constituting an extreme departure from the ordinary standard of care by:

    a.    depleting the Bank's capital reserves, so as to cause the Bank to be inadequately capitalized, by among other things, approving the Dividend, thereby transferring more than $8.8 million to CVB at a time when: (i) when the Bank's financial health was deteriorating precipitously, and (ii) when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining;

    b.    engaging in self-dealing and conflict of interest for their own benefit and to the detriment of the Bank, by among other things, approving the Dividend, thereby depleting the bank's capital reserves: (i) at a time when the Bank's financial health was deteriorating precipitously, (ii) at a time when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining, and (iii) in violation of policies promulgated by the Bank and regulatory authorities;

    c.    failing to inform themselves regarding the risks of the Dividend prior to approving it — and even failing to take the most rudimentary step of securing expert financial advice on the advisability of the Dividend given the Bank's flagging financial outlook, as well as worsening conditions in the national economy;

    d.    failing to follow any reasonable and prudent policies and procedures relating to consideration and/or consummation of the Dividend transactions, and instead (i) proceeding without any expert financial advice or analysis regarding the effect of these

transactions on the Bank's financial condition, (ii) failing to evaluate or consider available financial data when Defendants approved the Dividend in 2008,  (iii) structuring the Dividend in a way that would deplete the Bank's capital and directly benefit Defendants, and (iv) approving the Dividend in violation of policies promulgated by the Bank and regulatory authorities; and

e.   failing to ensure that the Dividend complied with the principles of safe and sound banking practices, when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the local real estate market and the national economy were declining.

82.   Defendants were grossly negligent in that their manner of carrying out their duties and responsibilities to the Bank constituted a want of even scant care or an extreme departure from the ordinary standard of care, as further described throughout this Complaint.

83.   As a direct and proximate result of these Defendants' gross negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $8.8 million.  As a further and direct proximate result of Defendants' actions as alleged in this Complaint, the Bank failed, resulting in its closure on August 20, 2010. Consequently, the FDIC-R has suffered further damages, in an amount to be proven at trial.

84.   With respect to all of their actions and inactions alleged herein, Defendants pursued a common plan or design with each other, and therefore are jointly and severally liable for all losses.

/ / /

/ / /

/ / /

/ / /

**<u>FOURTH CLAIM FOR RELIEF — BREACH OF FIDUCIARY DUTIES</u>**

**(AGAINST ALL DEFENDANTS FOR JOINT AND SEVERAL LIABILITY, AND IN THE ALTERNATIVE, AGAINST CHING, COGER, EVEN, LEFORCE, MATTHEWS, MORGAN, ROBBINS, STRAUSS, AND TOWNSHEND FOR SEVERAL LIABILITY)**

85.     Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1 through 64 of this Complaint, as though fully set forth herein.

86.     During the relevant time period, Defendants were directors and/or officers of the Bank.   As directors and/or officers of the Bank, Defendants owed fiduciary duties of care and loyalty to the Bank to act with the utmost care and in the best interests of the Bank.

87.     The duty of care requires directors and officers to act prudently in light of all reasonably available information in overseeing the corporation's business and making decisions on its behalf.   Defendants' fiduciary duty of care included the duties:

a.     To maintain adequate capitalization of the Bank, and to avoid depleting the Bank's reserves so as to cause the Bank to be undercapitalized;

b.     To fully inform themselves regarding the risks of particular transactions prior to approving those transactions, including obtaining sufficiently detailed, current and reliable information to allow them to make prudent decisions;

c.     To adopt such careful, reasonable and prudent policies and procedures as required to ensure that the Bank did not engage in unsafe and unsound banking practices, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures; and

1       d.    To ensure that any transactions complied with the principles of

2              safe and sound banking practices.

3    88.   Defendants' duty of loyalty included the duties:

4       a.    To avoid self-dealing and other conflicts of interest;

5       b.    To act in good faith; and

6       c.    To act in the best interests of the Bank.

7    89.   Defendants breached their fiduciary duties by, among other things:

8       a.    depleting the Bank's capital reserves, so as to cause the Bank to

9              be inadequately capitalized, by among other things: approving

10            the Dividend, thereby transferring more than $8.8 million to

11            CVB: (i) at a time when the Bank's financial health was

12            deteriorating precipitously, (ii) at a time when the Bank's

13            financial health was compromised by excessive concentration in

14            real estate lending at a time when the real estate market and the

15            national economy were declining, and (iii) in violation of

16            policies promulgated by the Bank and regulatory authorities;

17       b.    engaging in self-dealing and conflict of interest for their own

18            benefit and to the detriment of the Bank,  by among other things,

19            approving the Dividend, thereby depleting the Bank's capital

20            reserves: (i) at a time when  the Bank's financial health was

21            deteriorating precipitously, (ii) at a time when  the Bank's

22            financial health was compromised by excessive concentration in

23            real estate lending at a time when the real estate market and the

24            national economy were declining, and (iii) in violation of

25            policies promulgated by the Bank and regulatory authorities;

26       c.    failing to inform themselves regarding the risks of the Dividend

27            prior to approving it — and even failing to take the most

28            rudimentary step of securing expert financial advice on the

advisability of the Dividend given the Bank's flagging financial outlook, as well as worsening conditions in the national economy;

d.   failing to follow any reasonable and prudent policies and procedures relating to consideration and/or consummation of the Dividend, and instead (i) proceeding without any expert financial advice or analysis regarding the effect of these transactions on the Bank's financial condition, (ii) failing to evaluate or consider available financial data when Defendants approved the Dividend in 2008, (iv) structuring the Dividend in a way that would deplete the Bank's capital and directly benefit Defendants, and (iii) in violation of policies promulgated by the Bank and regulatory authorities; and

e.   failing to ensure that the Dividend complied with the principles of safe and sound banking practices, when the Bank's financial health was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining.

90.   Defendants Ching, Coger, Even, Leforce, Matthews, Morgan, Robbins, Strauss, and Townshend additionally breached their duty of loyalty by benefiting personally from the Dividend as a result of their participation in the Tender Offer, from which they received a combined $3,473,860, because, among other things:

a.   the Bank's financial health was deteriorating precipitously and was compromised by excessive concentration in real estate lending at a time when the real estate market and the national economy were declining;

b.   the Dividend violated policies promulgated by the Bank and regulatory authorities;

1           c.    the Dividend was intended to benefit themselves to the detriment

2               of the Bank.

3        91.    In committing the foregoing breaches, the Defendants acted

4 unreasonably under the circumstances known to them at the time, and otherwise

5 wholly abdicated their corporate responsibilities by closing their eyes to known

6 risks, did not act in good faith and did not act with the belief that their actions were

7 in the best interests of the Bank.

8        92.    As a direct and proximate result of Defendants' breach of fiduciary

9 duties, the FDIC-R suffered damages in an amount to be proven at trial, in excess of

10 $8.8 million.  As a further and direct proximate result of Defendants' actions as

11 alleged in this Complaint, the Bank failed, resulting in its closure on August 20,

12 2010.  Consequently, the FDIC-R has suffered further damages, in an amount to be

13 proven at trial.

14       93.    With respect to all of their actions and inactions alleged herein,

15 Defendants pursued a common plan or design with each other, and therefore are

16 jointly and severally liable for all losses.

17       94.    To the extent not otherwise awarded, Defendants Ching, Coger, Even,

18 Leforce, Matthews, Morgan, Robbins, Strauss, and Townshend are liable for the

19 amounts each received as a result of their participation in the Tender Offer funded

20 by the Dividend to the extent not otherwise awarded.

21               **REQUEST FOR RELIEF**

22     WHEREFORE, Plaintiff the FDIC-R requests relief from Defendants as

23 follows:

24          A.    For compensatory and consequential damages, jointly and

25               severally, in a minimum amount of $8.8 million and any excess

26               amount to be proven at trial;

27          B.    For compensatory damages from Defendants Ching, Coger,

28               Even, Leforce, Matthews, Morgan, Robbins, Strauss, and

1   Townshend in the amounts each received as a result of their

2   participation in the Tender Offer funded by the Dividend to the

3   extent not otherwise awarded;

4   C.   For its costs of suit against all Defendants;

5   D.   For prejudgment interest;

6   E.   For attorneys' fees, and costs for the investigation and litigation;

7   F.   For such other and further relief as this Court deems just and

8   proper.

9   Dated: August 19, 2013                    Respectfully submitted:

10                                            ZUBER LAWLER & DEL DUCA LLP
11                                            JOHNNY DARNELL GRIGGS
12
13
14   By: _____
15        Attorneys for Federal Deposit Insurance
         Corporation
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTIES

# DEMAND FOR JURY TRIAL

Plaintiff the FDIC-R hereby demands trial by jury in this action.

Dated: August 19, 2013                    Respectfully submitted:

                                          **ZUBER LAWLER & DEL DUCA LLP**
                                          JOHNNY DARNELL GRIGGS

                              By: _____
                                          Attorneys for Federal Deposit Insurance
                                          Corporation as Receiver for Butte
                                          Community Bank

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTIES

1620-1002 / 333467.1