1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FEDERAL DEPOSIT INSURANCE                    No.  2:13-cv-01710-KJM-EFB
     CORPORATION AS RECEIVER FOR
12   BUTTE COMMUNITY BANK,

13                  Plaintiff,                    ORDER

14         v.

15   ROBERT CHING, et al.,

16                  Defendant.

17

18

19              The Federal Deposit Insurance Corporation (FDIC),[1] acting as receiver for Butte

20   Community Bank (the Bank), brought this lawsuit against several of the Bank's former officers

21   and directors.  Its case concerns a series of transactions in the first half of 2008.  The FDIC

22   alleges these transactions were the directors' attempt to strip the Bank of cash and assets it

23   desperately needed to weather the 2008 financial crisis.  The directors aver they intended nothing

24   untoward but rather designed the transactions to benefit the Bank's shareholder and maintain a

25   respectable return on equity.

26   _____

27         [1] In previous orders the court has referred to this entity both as the FDIC and the FDIC-R.
     *Compare, e.g.*, Order July 8, 2014, ECF No. 40, *with, e.g.*, Order Feb. 2, 2015, ECF No. 125.  It
28   is the same entity.

                                          1

In this motion the FDIC seeks summary judgment on all but one of the directors' affirmative defenses.  The court held a hearing on February 26, 2016.  Jean-Paul Cart and David Giles appeared for the FDIC, and Kevin Hughes appeared for the directors.  For the following reasons, the motion is granted in part.

## I.      EVIDENTIARY OBJECTIONS

As a preliminary matter, the parties have made several evidentiary objections.  Because the defendants have withdrawn six of their affirmative defenses, the court overrules as moot any objections to evidence the FDIC relies on solely with respect to these withdrawn defenses.  All but one of the remaining evidentiary disputes concern evidence that does not influence the court's decision here, most notably the directors' motivations in approving the transaction at issue and the Bank's financial state between 2006 and 2009.  *See* Defs.' Resp. Stmt. Undisputed Material Facts (UMF) nos. 5–13, ECF No. 128-1.  These objections are also overruled as moot.

The exception is Exhibit 31 to the declaration of the FDIC's attorney, Jean-Paul Cart.  Exhibit 31 is a copy of an April 11, 2008 email from John Coger to Robert Hartline attaching a "Comparative Statement of Condition and the addendum for the newsletter."  Cart Decl. Ex. 31, ECF No. 124-34.  Mr. Cart avers Exhibit 31 is a true and correct copy of an exhibit discussed during the deposition of John Coger.  Cart Decl. ¶ 32.  Mr. Coger agreed during his deposition that he composed the email and described the attachments, providing a sufficient foundation for its consideration in this order.  *See* Coger Dep. 312–18.  The directors appear to object, however, that the exhibit is hearsay if relied upon for its truth.  *See* UMF no. 8.  That objection is overruled.  When presented by the FDIC, Mr. Coger's statements are those of the FDIC's opponent, and are not hearsay.  *See* Fed. R. Evid. 801(d)(2).

## II.     UNDISPUTED FACTS

The Bank opened in 1990.  Compl. ¶ 21, ECF No. 1; Answer ¶ 12, ECF No. 7.  Twelve years later, in 2002, Community Valley Bancorp (CVB) acquired all the Bank's outstanding shares.  Compl. ¶¶ 25–26; Answer ¶¶ 15–16.  CVB existed primarily as a holding

/////

1  company for the Bank and other subsidiaries, and CVB's principle source of income was

2  dividends paid from its shares in the Bank.  Compl. ¶ 26; Answer ¶ 16.

3        The defendants in this case are Robert Ching, Eugene Even, Donald Leforce,

4  Luther McLaughlin, Robert Morgan, James Rickards, Gary Strauss, Hubert Townshend, John

5  Coger and Keith Robbins, who were directors of both the Bank and CVB beginning in 2004, with

6  the exception of Luther McLaughlin, who served in those capacities first in 2006.[2]  *See* Compl.

7  ¶¶ 6–16; Answer ¶¶ 5–8.

8        In spring 2008 and "for a long time" before that, the directors were concerned

9  about concentrations of loans in the Bank's debt portfolio.  Coger Dep. 317–28.  In 2008, John

10  Coger forwarded a statement to include in the Bank's newsletter, which warned that the

11  "subprime housing debacle has had a dramatic effect on real estate construction loans," and that

12  the downturn in the market for subprime loans had a negative effect on the Bank.  *Id.* at 316; Cart

13  Decl. Ex. 31, at 2, ECF No. 124-34.  CVB's 2009 Form 10-K reported that between 2007 and

14  2009, CVB's net income declined from about a positive $6.5 million to a net loss of about $27.5

15  million.  Cart Decl. Ex. 7, at 3, ECF No. 124-10.[3]

16        During this same period of time, in early 2008, the directors approved a three-part

17  transaction.  *See* Robbins Decl. ¶ 3, ECF No. 128-3; Coger Decl. ¶ 3 & Ex. A, at 7.  First, the

18  Bank would sell seven of its branch properties and lease back the buildings.  Robbins Decl. ¶ 3.

19  Second, using the cash influx from the sale, the Bank would distribute a dividend of $8.8 million

20  to CVB, its sole shareholder.  *Id.*  And third, CVB would combine that $8.8 million with about

21  $4.2 million of its own cash to fund a $13 million tender offer for about one million CVB shares.

22  *Id.*  The transaction was completed in May 2008.  Compl. ¶ 37; Answer ¶ 26.

23        The directors were among CVB's shareholders at the time of this three-part

24  transaction.  *See, e.g.*, Morgan Dep. 143.  The FDIC has presented evidence that at least one of

25

26        [2] Ellis Matthews, formerly a defendant, was recently dismissed.  ECF No. 145.

27        [3] The court takes judicial notice that this Form 10-K included the statements reported
   above.  *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 n.143 (C.D.

28  Cal. 2012) (the existence and contents of SEC filings are subject to judicial notice).

1   the directors' motivations for this transaction was to allow the directors to sell larger numbers of

2   their shares at higher prices than they would otherwise have been able. *Id.* at 142–47.  Robert

3   Morgan testified in his deposition that the dividend transaction was part of his "exit strategy" for

4   retirement. *Id.*

5          On August 20, 2010, the California Department of Financial Institutions closed the

6   Bank, and the FDIC was appointed as receiver.  UMF no. 1.

7   III.    <u>PROCEDURAL HISTORY</u>

8          The FDIC alleges the three-part transaction described above stripped the Bank of

9   needed cash, enriched the directors, and caused the Bank's failure.  It filed its complaint in this

10  court on August 19, 2013, asserting four claims: common law negligence; gross negligence under

11  12 U.S.C. § 1821(k), a provision of the Financial Institutions Reform, Recovery, and

12  Enforcement Act of 1989 (FIRREA); gross negligence under California Corporations Code

13  section 309; and breaches of fiduciary duties.  Compl., ECF No. 1.

14         Early on in the case, the directors moved for summary judgment.  They argued

15  several specific provisions of the California Corporations and Finance Codes, the "dividend

16  statutes," preempted the FDIC's claims of negligence and breaches of fiduciary duty.  Mot.

17  Summ. J., ECF No. 19.  They also challenged the FDIC's standing under FIRREA, and argued

18  Corporations Code section 309 gives rise to no independent right of action.  *Id.*  The court denied

19  summary judgment on the second and third claims under FIRREA and section 309.  Order July 8,

20  2014, at 10, ECF No. 40.  The court held that section 309 set forth the applicable standard of care,

21  regardless of the directors' compliance with the dividend statutes.  *Id.* at 6–10.  The court granted

22  summary judgment on the common law claims for negligence and breach of fiduciary duties,

23  finding these claims were preempted by section 309.  *Id.* at 10.

24         In December 2014, the directors again moved for summary judgment, arguing

25  section 309 could not serve as the basis of the FDIC's FIRREA and section 309 claims because

26  the dividend statutes addressed in their earlier motion were more specific and relevant, and as a

27  matter of statutory interpretation, these more specific sections provided the rule of decision rather

28  than the general rule of section 309.  Mem. Summ. J. at 4–9, ECF No. 45.  They also argued the

4

FDIC lacked standing to bring any dividend-related claim.  *Id.* at 9–16.  The court determined the FDIC had constitutional and statutory standing and found the directors' statutory interpretation arguments reiterated those of their first motion.  Order July 27, 2015, ECF No. 86.  The court also disagreed that irreconcilable differences between the dividend statutes and section 309 prevented application of section 309 in this case.  *Id.* at 10–12.

The directors requested clarification and reconsideration of the court's second order in August 2015.  ECF No. 94.  They requested the court clarify that the FDIC would lack standing under section 309 were it to stand solely in the shoes of the Bank's depositors.  Because the court had already concluded the FDIC had standing under section 309, it found the requested additional finding would not meaningfully narrow any dispute and declined to make the clarification requested.  Order Dec. 1, 2015, at 2, ECF No. 117.  The defendants also requested the court reconsider its decision that a director may be liable under section 309, even if she complied with the specific statutes defining impermissible dividends.  The motion was denied because the directors had advanced many of the same arguments raised in their previous motions, or variations of the same arguments.  *Id.* at 3.

The FDIC filed its current motion on January 22, 2016.  ECF No. 124-1.  It moves for partial summary judgment on seventeen of the directors' eighteen affirmative defenses.  The defense it does not address is the directors' assertion that the FDIC's claims are "barred by the business judgment rule."  Answer at 11.  The defendants opposed the motion in part.  ECF No. 128.  They withdrew six of their affirmative defenses: failure to mitigate damages, contributory and comparative negligence, supervening causation, estoppel, waiver, and laches.  They also clarified that they did not intend their eighteenth affirmative defense as an affirmative defense, but as a reservation of the right to amend their list of defenses.  *See id.* at 15–16.  This leaves the following ten defenses within the scope of the FDIC's motion: failure to state a claim upon which relief may be granted; unclean hands; the statute of limitations; accord and satisfaction; release; the FDIC's lack of legal capacity in this case; offset; statutory preemption of

/////

/////

5

1   common law rights and remedies; unjust enrichment; and compliance with legal requirements.

2   The FDIC replied on February 19, 2016.  ECF No. 130.[4]

3   IV.      LEGAL STANDARD

4               A court must grant a motion for summary judgment "if the movant shows there is

5   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

6   law." Fed. R. Civ. P. 56(a).  A motion for summary judgment calls for a "threshold inquiry" into

7   whether "any genuine factual issues . . . properly can be resolved only by a finder of fact because

8   they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*,

9   477 U.S. 242, 250 (1986).  The court does not weigh evidence or assess the credibility of

10  witnesses; rather, it determines which facts the parties do not dispute, then draws all inferences

11  and views all evidence in the light most favorable to the nonmoving party.  *See id.* at 255;

12  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  "Where the

13  record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

14  there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of*

15  *Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

16              The moving party bears the initial burden of "informing the district court of the

17  basis for its motion, and identifying those portions of [the record] which it believes demonstrate

18  the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

19  (1986).  If the party opposing summary judgment bears the burden of proof at trial, as for

20  example a defendant who asserts an affirmative defense, *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271,

21  1284 (9th Cir. 1993), the moving party need only illustrate the "absence of evidence to support

22  the non-moving party's case," *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

23  The burden then shifts to the nonmoving party to "go beyond the pleadings" and "designate

24  specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation

25  marks omitted).  The non-moving party "must do more than simply show that there is some

26

27              [4] During the time this motion was pending, the court denied the directors' motion to
    amend their answer and allege an additional affirmative defense based on their immunity under

28  the Bank's articles of incorporation.  *See* Order May 4, 2016, ECF No. 146.

1    metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "Only disputes over

2    facts that might affect the outcome of the suit under the governing law will properly preclude the

3    entry of summary judgment." *Anderson*, 477 U.S. at 248.

4    V.      DISCUSSION

5              The court considers each of the remaining affirmative defenses in turn: failure to

6    state a claim, statutory preemption, compliance with the law, lack of legal capacity, unclean

7    hands, the statute of limitations, release and accord and satisfaction, double recovery, and unjust

8    enrichment.

9            A.      Failure to State a Claim

10             No binding precedent prevents a defendant from asserting, as an affirmative

11   defense, that the complaint does not state a claim on which relief can be granted.  Persuasive

12   authority is uncertain on this question, even within this district.  *See, e.g.*, *J & J Sports Prods.,*

13   *Inc. v. Delgado*, No. 10-2517, 2011 WL 219594, at *2 & n.2 (E.D. Cal. Jan. 19, 2011).  The

14   undersigned has sided with what appears to be the majority, and has found that failure to state a

15   claim is not an affirmative defense.  *See, e.g.*, *Lexington Ins. Co. v. Energetic Lath & Plaster,*

16   *Inc.*, No. 15-00861, 2015 WL 5436784, at *12 (E.D. Cal. Sept. 15, 2015).  Finding no reason to

17   depart from that conclusion here, the court grants FDIC's motion as to this defense.

18           B.      Statutory Preemption; Compliance with Legal Requirements

19             The FDIC argues the court's previous orders dispose of these affirmative defenses.

20   The directors acknowledge this court's previous orders foreclose these defenses but wish to

21   preserve them for appeal.  Summary judgment is granted as to these defenses.

22           C.      Lack of Legal Capacity

23             The FDIC argues the court's previous orders also dispose of this defense.  The

24   directors argue the question of the FDIC's standing to assert claims in the stead of the Bank's

25   depositors and account holders remains unresolved.  The court agrees that the FDIC's standing to

26   assert its two remaining claims is established, and that the court has not addressed whether the

27   FDIC has standing to assert claims on behalf of the Bank's depositors or account holders.

28   Because neither party has explained how resolution of this question would dispose of any issue

1    for trial, the motion is denied.  *See, e.g.*, *Anselmo v. Mull*, No. 12-1422, 2013 WL 3941779, at *2

2    (E.D. Cal. July 30, 2013) (denying summary judgment because "addressing plaintiffs' specific

3    arguments . . . would not be conducive to the conservation of judicial resources and of benefit to

4    the parties" (citation and quotation marks omitted)).

5             D.      Unclean Hands

6            The equitable defense of unclean hands allows a defendant to escape liability when

7    the plaintiff acts unconscionably, in bad faith, or inequitably.  *Salas v. Sierra Chem. Co.*, 59 Cal.

8    4th 407, 432 (2014).  Not just any wrong can support a defense of unclean hands; the misconduct

9    in question must "relate directly" to the transaction that underlies the plaintiff's case, it must

10    "pertain to the very subject matter involved and affect the equitable relations" between the

11    plaintiff and defendant.  *Id.* (citations and quotation marks omitted).

12             1.      Barred By Federal Common Law No-Duty Rule?

13            As a preliminary matter, the FDIC argues the directors cannot assert an unclean-

14    hands defense because, as receiver, the FDIC can owe no duty to the directors of a failed Bank.

15    *See* Mem. at 13 (citing, *inter alia*, *FDIC v. Baker*, 739 F. Supp. 1401, 1405–06 (C.D. Cal. 1990)).

16    This argument invokes a doctrine commonly referred to as the "no-duty" rule.  *See, e.g.*, *F.D.I.C.*

17    *v. Johnson*, 35 F. Supp. 3d 1286, 1293 (D. Nev. 2014).  It is a judicially created rule founded on

18    concerns of public policy, as explained in one commonly cited district court decision:  "nothing

19    could be more paradoxical or contrary to sound policy than to hold that it is the public which

20    must bear the risk of errors of judgment made by its officials in attempting to save a failing

21    institution—a risk which would never have been created but for defendants' wrongdoing in the

22    first instance."  *FSLIC v. Roy*, No. 87–1227, 1988 WL 96570, at *1 (D. Md. June 28, 1988);

23    *accord, e.g.*, *F.D.I.C. v. Oldenburg*, 38 F.3d 1119, 1121 (10th Cir. 1994); *F.D.I.C. v. Bierman*,

24    2 F.3d 1424, 1438 (7th Cir. 1993); *Baker*, 739 F. Supp. at 1407.

25            Although the no-duty rule has been described as "the clear majority rule,"

26    *Oldenburg*, 38 F.3d at 1121, its validity has been in question for some time now, *see, e.g.*,

27    *F.D.I.C. v. Skow*, 741 F.3d 1342, 1348–49 & n.12 (11th Cir. 2013) (per curiam); *Johnson*,

28    35 F. Supp. 3d at 1294–95; *Resolution Trust Corp. v. Liebert*, 871 F. Supp. 370, 373 (C.D. Cal.

1   1994).  The shift is likely attributable to the Supreme Court's unanimous decision in *O'Melveny*

2   *& Myers v. F.D.I.C.*, 512 U.S. 79 (1994).  *See, e.g.*, *Johnson*, 35 F. Supp. 3d at 1294–95.  In

3   *O'Melveny*, the FDIC acted as receiver for a bank that had failed as a result of its officers' and

4   directors' fraud.  512 U.S. at 81.  The FDIC sued a law firm that had represented the bank in

5   connection with two rescinded real estate transactions, alleging the firm was liable for

6   professional negligence and breach of fiduciary duty.  *Id.* at 81–82.  The law firm moved for

7   summary judgment.  *Id.* at 82.  It argued that under California law, (1) knowledge of the fraud

8   was imputed from the bank's former directors to the bank and (2) the bank's knowledge was in

9   turn imputed to the FDIC as the bank's receiver.  *Id.*  Thus, the law firm argued, because a

10   fraudster cannot defraud himself, the FDIC was estopped from bringing its claims.  *Id.*

11          The district court granted summary judgment, and the Ninth Circuit reversed.  *Id.*

12   The Ninth Circuit held that even assuming the former directors' knowledge could be imputed to

13   the bank, the same knowledge could not be imputed to the FDIC.  *See F.D.I.C. v. O'Melveny &*

14   *Myers*, 969 F.2d 744, 751–52 (9th Cir. 1992), *rev'd*, 512 U.S. 79 (1994).  It reasoned that federal

15   law, not state law, "governs the application of defenses against FDIC."  *Id.* at 751.  The Circuit

16   therefore "fashion[ed] a federal rule of decision," and concluded that "equitable defenses good

17   against a bank do not carry over against the bank's receiver."  *Id.*

18          On certiorari, the Supreme Court reversed.  512 U.S. at 89.  It dismissed three

19   arguments the FDIC advanced in defense of the circuit court's decision below.  First, it held that

20   "California law, not federal law, governs the imputation of knowledge to corporate victims of

21   alleged negligence" because "'[t]here is no federal general common law.'"  *Id.* at 83–85 (quoting

22   *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

23          Second, it held that 12 U.S.C. § 1821(d)(2)(A)(i), which establishes the powers

24   and duties of the FDIC as receiver, could not serve as a foothold for development of federal

25   common law.  *See id.* at 85–87.  That section indicates the FDIC "steps into the shoes" of a failed

26   bank when it becomes receiver and therefore obtains the former bank's rights.  *Id.* at 86.  In

27   *O'Melveny,* these rights included California-law tort claims against former officers and directors.

28   *Id.*  In the same vein, these claims would be subject to the defenses the former bank would have

9

1  faced, such as that the bank's officers had knowledge; after all, "any defense good against the

2  original party is good against the receiver." *Id.* (quoting 969 F.2d at 751, in turn quoting *Allen v.*

3  *Ramsay*, 179 Cal. App. 2d 843, 854 (1960)).  Because FIRREA provides for specific exceptions

4  to this general rule, in which it displaces state law—for example, it extends state statutes of

5  limitations and permits claims of gross negligence—the section could not be read to allow the

6  FDIC additional, judge-created rights.  *See id.* at 86–87 ("*Inclusio unius, exclusio alterius.*").

7        Third, the Supreme Court rejected the argument that federal policy interests so

8  conflicted with California law that California law must be displaced.  *Id.* at 87–89.  The most

9  significant purported federal interest was "that it would disserve the federal program to permit

10  California to insulate the attorney's or accountant's malpractice, thereby imposing costs on the

11  nation's taxpayers, rather than on the negligent wrongdoer." *Id.* at 89 (citation and quotation

12  marks omitted).[5]  If this were true, the Supreme Court reasoned, the federal courts would task

13  themselves with the definition of state law tort and fiduciary duty.  *Id.*

14        If *O'Melveny* does not dispose of the no-duty rule directly, at a minimum it is

15  sunlight to the snowman.  For one, like the rule at issue in *O'Melveny*, the no-duty rule at issue

16  here may aptly be described as an addition to or alteration of § 1821, but under *O'Melveny*,

17  federal common law may not append provisions to that section.  *See* 512 U.S. at 86–87.  Second,

18  the primary justification for the no-duty rule is the federal policy against allocating the risk of the

19  FDIC's errors in judgment to the public.  *See Roy*, 1988 WL 96570, at *1.  But the *O'Melveny*

20  Court left no doubt a nearly identical policy—the policy against imposing the costs of an

21  attorney's or accountant's negligence on the nation's taxpayers—could not support the creation of

22  federal common law.  512 U.S. at 89.

23  _____

24  [5] On remand, the Ninth Circuit was "surprised to see this case back from the Supreme
   Court, having previously disposed of it largely on state law grounds—or so we thought."  61 F.3d
25  17, 18 (9th Cir. 1995) (per curiam).  It reached the same conclusion as before, reasoning that
   although "any defense good against the original party is good against the receiver," *id.* at 19
26  (quoting *Allen*, 179 Cal. App. 2d at 854), defenses based on a party's unclean hands or
   inequitable conduct do not generally apply against that party's receiver, *id.* (citing *Camerer v.*
27  *Cal. Sav. & Commercial Bank*, 4 Cal. 2d 159, 170–71 (1935)).  This reasoning does not apply
   here, however, as the directors' unclean-hands defense charges the FDIC itself, not the failed
28  Bank, with inequitable behavior.

1    Because the FDIC has identified no sound basis for the creation of a federal

2    common law no-duty rule, its motion cannot be granted on that basis.  The court therefore

3    proceeds to the merits of the directors' unclean-hands defense.

4              2.        Merits of Defense

5              Here, the directors claim the FDIC acted unconscionably when, just before it filed

6    this lawsuit, it entered an agreement with CVB that included the following release:

> Except as expressly set forth herein, FDIC-R hereby forever
> releases and discharges CVB and its representatives, agents,
> accountants, and attorneys from any and all causes of action . . .
> which have existed at any time up until the date of this Agreement,
> provided, however, that nothing in this Agreement shall be
> construed to constitute a waiver of any claims by FDIC-R or the
> Receivership . . . against any past or present officer, director, or
> representative of the Bank arising out of any breach of duties owed
> by such officer, or director or representative to the Bank . . . .

12   Coger Decl. Ex. G, at 4, ECF Nos. 128-4, 129.  Releasing these claims was unconscionable, the

13   directors explain, because under California Corporations Code section 316(f)(1), corporate

14   directors who approve a wrongful dividend are subrogated to the rights of their corporation to sue

15   any shareholder who received that dividend.  *See* Opp'n at 5, 13.  As applied here, the directors

16   interpret this section to allow them to sue CVB, the Bank's lone shareholder, and recover any

17   damages they are made to pay to the FDIC.  Thus the FDIC signed their rights away when it

18   signed the release: by releasing the Bank's claims, the FDIC released claims to which the

19   directors argue they were subrogated.  *See* Opp'n at 13.

20              a.   Non-Disclosure During Discovery

21              The directors did not identify the release agreement as a basis for their unclean

22   hands defense in their discovery responses.  *See* UMF no. 19(b); Cart Decl. Ex. 24, at 3–5, ECF

23   No. 124-27.  Rule 26 provides that a party must supplement its responses to an interrogatory or

24   similar discovery request "if the party learns that in some material respect the disclosure or

25   response is incomplete or incorrect, and if the additional or corrective information has not

26   otherwise been made known to the other parties during the discovery process or in writing."  Fed.

27   R. Civ. P. 26(e)(1).  If a litigant does not follow this rule, it "is not allowed to use that information

28   or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was

1  substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  The one who faces sanctions

2  must prove his tardy disclosure was justified or harmless.  *R & R Sails, Inc. v. Ins. Co. of Pa.*,

3  673 F.3d 1240, 1246 (9th Cir. 2012).  Under these rules, undisclosed information is ordinarily

4  excluded, but not if the exclusion would amount to outright dismissal of a claim or defense.  *See*

5  *id.* at 1247–48.  In that instance, the court must consider whether the litigant facing exclusion

6  acted willfully or in bad faith and whether an alternative sanction would suffice.  *Id.*

7          Here, the directors' non-disclosure was harmless, and nothing suggests the

8  directors acted willfully or in bad faith.  The settlement agreement's substantive provisions are no

9  surprise to the FDIC because it signed the agreement.  Both in its reply brief and during

10  arguments at hearing, the FDIC was also able to respond to the directors' newly asserted theory of

11  inequitable conduct.  The court declines to exclude this defense under Rule 37.

12                          b.  Section 316 Liability

13          This leaves the defense itself.  The directors' affirmative defense is founded on

14  Corporations Code section 316.  That section provides, in relevant part, "Directors liable under

15  this section shall also be entitled to be subrogated to the rights of the corporation . . . against

16  shareholders who received the distribution."  Cal. Corp. Code § 316(f)(1).  That is, only if a

17  director is liable under section 316 is she subrogated to the corporation's rights against its

18  shareholders.  In this lawsuit, however, the FDIC asserts no claims under section 316 and has

19  made no attempt to prove the directors are liable under that section.  In the directors' previous

20  motion for summary judgment, it was undisputed the FDIC alleged no facts that would support

21  the directors' liability under section 316.  *See* Pl.'s Resp. Statement of Facts nos. 1–3, ECF

22  No. 58-1.  Because on this record the directors' liability under section 316 is uncertain at best,

23  and they bear the burden to demonstrate the viability of this defense both at trial and in opposition

24  to the FDIC's motion, the motion must be granted.

25          In addition, as a practical matter, the directors' argument is unpersuasive, even if

26  creative.  They argue on the one hand that as the Bank's directors, they may be forced to pay

27  damages to the FDIC; therefore, under section 316, they could sue CVB to recover the wrongfully

28  approved dividend.  And on the other hand, they argue the FDIC and CVB signed away the

1  Bank's claim against CVB.  But these defendants were CVB's directors as well as the Bank's

2  directors, and they represented a substantial block of CVB's shareholders.  No evidence suggests

3  the FDIC negotiated its settlement covertly or that CVB was under duress when its officers—the

4  defendants—decided to approve that agreement.  Defendant Coger himself signed the agreement

5  as CVB's president and CEO.  *See* Coger Decl. ¶ 13; *id.* Ex. G, at 10.  Summary judgment is

6  granted on this defense.

7             E.        Statute of Limitations

8             The statute of limitations for a tort claim under FIRREA is either (1) three years

9  after the FDIC is appointed receiver or (2) the date a tort claim accrues under the applicable state

10  statute of limitations, whichever is later.  12 U.S.C. § 1821(d)(14)(A), (B); *see also F.D.I.C. v.*

11  *McSweeney*, 976 F.2d 532, 534 (9th Cir. 1992) ("[T]he FDIC has at least three years after a failed

12  [bank] goes into receivership to file tort claims against former officers or directors; any longer

13  period applicable under state law controls.").  But these provisions do not ordinarily revive a

14  claim that lapsed before the FDIC was appointed receiver.  *McSweeney*, 976 F.2d at 534.[6]

15             A number of state-law limitations periods could, at first glance, be applicable to

16  the FDIC's claims.  California law imposes a two-year limitations period on negligence claims,

17  whether ordinary or professional.  *Yun Hee So v. Sook Ja Shin*, 212 Cal. App. 4th 652, 662 (2013)

18  (ordinary negligence; citing Cal. Civ. Proc. Code § 335, 335.1); *Cyr v. McGovran*, 206 Cal. App.

19  4th 645, 651 (2012) (professional negligence; citing Cal. Civ. Proc. Code § 339(1)).  Actions in

20  fraud or mistake are subject to a three-year limitations period.  *See* Cal. Civ. Proc. Code § 338(d).

21  Otherwise, if no other section provides for a statute of limitations, the period is four years.  *See*

22

23  _____

     [6] The exception to this general rule allows the revival of lapsed claims that arise "from
24  fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting
     in substantial loss to the institution," provided those claims expired within the five years before
     the FDIC was appointed receiver.  *See* 12 U.S.C. § 1821(d)(14)(C).  This exception does not
25  apply here because neither gross negligence nor breach of fiduciary duties is "intentional
     misconduct."  *See F.D.I.C. v. Henderson*, 61 F.3d 421, 424–25 (5th Cir. 1995).

26        *McSweeney* did not address this exception because the enacting legislation was not signed
     into law until September 1994, after the *McSweeney* opinion was issued.  *See* Riegle-Neal
27  Interstate Banking and Branching Efficiency Act of 1994, Pub. L. No. 103-328, § 201, 108 Stat.
28  2368 (1994).

1   *id.* § 343.  These same choices also apply to the FDIC's section 309 claim.  *See Briano v. Rubio*,

2   46 Cal. App. 4th 1167, 1180 (1996) (the limitations period of section 359 of the California Code

3   of Civil Procedure does not apply to Corporations Code section 309); *see also Am. Master Lease*

4   *LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1479 (2014) ("The statute of limitations for

5   breach of fiduciary duty is three years or four years, depending on whether the breach is

6   fraudulent or nonfraudulent.").

7            To determine which statute of limitations applies, California courts look to the

8   "gravamen" of the complaint or "the nature of the cause of action," not the label the plaintiff

9   applies to its claims.  *See, e.g.*, *Thomson v. Canyon*, 198 Cal. App. 4th 594, 606 (2011).  "A

10  limitations period begins to run when the cause of action accrues."  *Pedro v. City of L.A.*, 229 Cal.

11  App. 4th 87, 102 (2014).  "Traditionally at common law, a cause of action accrues when it is

12  complete with all of its elements—those elements being wrongdoing, harm, and causation."

13  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1191 (2013) (citations, quotation marks, and

14  alterations omitted).

15           Here, the transaction was approved and completed in May 2008.  Compl. ¶¶ 36-37;

16  Answer ¶¶ 25–26.  The FDIC was appointed receiver on August 20, 2010.  UMF no. 1.  The

17  FDIC's complaint was filed on August 19, 2013.  ECF No. 1.

18           Putting these rules and dates together, if negligence is the gravamen of the FDIC's

19  claims, and if a reasonable trier of fact could conclude its claims accrued more than two years

20  before August 19, 2013, the FDIC's motion must be denied.  But to the extent the gravamen of

21  the FDIC's complaint is breach of fiduciary duty, the motion must be granted.  So what is the

22  gravamen of the FDIC's claim?  As noted above, the court previously granted the directors'

23  motion for summary judgment on the FDIC's claims for common-law negligence and common-

24  law breach of fiduciary duty.  *See* Order July 8, 2014, at 5–7, ECF No. 40.  The court found these

25  claims were preempted by Corporations Code section 309.  Citing that order, the directors now

26  argue the FDIC's remaining claims sound in negligence alone.  *See* Opp'n at 11–12.  For three

27  reasons, the court disagrees.

28  /////

                                                14

First, the court's previous orders did not erase the FDIC's allegation that the directors breached their fiduciary duties; rather, the court held that claims for a director's breach of fiduciary duties "must be brought under the applicable statute," whatever that may be.  Order July 8, 2014, at 7.  In this case, for purposes of the FDIC's California-law claims, that statute is Corporations Code section 309.  For that reason, summary judgment was granted as to the complaint's common-law articulations of those duties.[7]

Second, California appellate courts have held at least three times that section 309 codifies a corporate director's common-law fiduciary duties.  In *Smith v. Superior Court*, the Court of Appeal held that section 309 "conveys the Legislature's intent that any action by a beneficiary of the fiduciary relationship must necessarily flow from [section 309]."  217 Cal. App. 3d 950, 953 (1990).  Thus, although the *Smith* plaintiff's complaint did not invoke section 309, the case resonated in the section-309 register, because the "alleged failure to act was in [the defendant's] capacity as voting director."  *Id.* at 954–55.  Later, in *Briano v. Rubio*, the Court of Appeal concluded *Smith* had misinterpreted the phrase "created by law" as used in California Code of Civil Procedure 359, but it agreed with *Smith* that "Corporations Code section 309 . . . defines the standard for determining the personal liability of a director for breach of his or her fiduciary duty to a profit corporation."  *See* 46 Cal. App. 4th at 1177–78.  The *Briano* court explained, "Section 309 combines the notion of a director's immunity from liability for an honest mistake of business judgment with the concept of a director's obligation to use reasonable diligence in performing his or her duties."  *Id.* at 1178.  And in *Lehman v. Superior Court*, the Court of Appeal considered the conflict between *Smith* and *Briano*, sided with *Briano*, and reiterated that section 309 codified preexisting common law duties.  *See* 145 Cal. App. 4th 109, 116–21 (2006).  Together, these decisions stand for the proposition that section 309 "did not give

/////

---

[7] The court's order on the defendant's second motion for summary judgment did not modify its previous holding in this respect.  *See* Order July 27, 2015, at 3 ("The court held [in its first order] that section 309 set forth the applicable standard of care and the FDIC had stated claims for negligence under both section 1821(k) and section 309, even though the complaint did not allege a violation of the state law 'dividend statutes.'").

1   rise to any *new* liability," *id.* at 120 (emphasis in original), but codified a director's longstanding

2   common-law duties, including her fiduciary duties.

3          Third, though the FDIC's remaining claims are labeled "gross negligence," those

4   claims charge the directors with "depleting the Bank's capital reserves, . . . engaging in self-

5   dealing and conflicts of interest for their own benefit and to the detriment of the Bank, . . . failing

6   to inform themselves regarding the risks of the Dividend prior to approving it, . . . [and] failing to

7   follow any reasonable and prudent policies and procedures relating to consideration and/or

8   consummation of the Dividend and Sale Leaseback . . . ."  Compl. ¶ 66.  The terms "self-

9   dealing," "conflicts of interest," and "failure to inform" ring of classic fiduciary duties.  *Cf., e.g.*,

10  *Lawrence v. I.N. Parlier Estate Co.*, 15 Cal. 2d 220, 229 (1940) ("[I]t has ever been the rule that

11  the powers of officers and directors of a corporation must be exercised in good faith and with a

12  view to the best interests of the shareholders as well as of the corporation."); *Prof'l Hockey Corp.*

13  *v. World Hockey Ass'n*, 143 Cal. App. 3d 410, 414 (1983) (a director's fiduciary duties include

14  duties of obedience, diligence, and loyalty in the management of corporate affairs and obligations

15  of trust and confidence to the corporation and its stockholders).  The court therefore concludes

16  that among the FDIC's remaining claims is at least one whose gravamen is the directors' breach

17  of fiduciary duties.

18         But the FDIC's complaint also includes claims of negligence, now funneled into

19  its claim under Corporations Code section 309.  The FDIC unambiguously spells out its theory

20  that the directors breached duties of care.  *See, e.g.*, Compl. ¶¶ 65, 73; *see also* Opp'n Mot. Am.

21  at 9, ECF No. 137 (the FDIC argues the complaint states a claim for negligence).  In this way the

22  FDIC's case may fairly be described as founded on two violations of section 309: one for

23  negligence, and one for breaches of fiduciary duties.  For this reason its motion must be denied in

24  part as to its claims for negligence and granted in part as to its claims for breach of fiduciary

25  duties.  If the directors prove the FDIC's negligence claims accrued outside the applicable period,

26  they may successfully assert a defense.

27  /////

28  /////

16

1    F.    Release; Accord and Satisfaction

2         The defendants argue the FDIC's agreement with CVB, *see supra* part D, pages

3    8-13, released all claims the Bank or FDIC might have against CVB.  Opp'n at 14.  Thus they

4    argue the FDIC has released any claims arising under their capacity as directors of CVB.  *Id.*

5    They advance no other opposition to the FDIC's motion in this respect.  In reply, the FDIC

6    confirmed it "is not suing Defendants to impose liability 'in their capacity as CVB directors.'"

7    Reply at 10.  The motion is therefore granted as to this defense.

8    G.    Double Recovery: Offset and Unjust Enrichment

9         The directors advance three similar defenses on the basis of the same general

10   theory.  They argue any damages they are made to pay must be reduced by three payments made

11   to the Bank: (1) a $4 million payment from CVB to the Bank in June 2008; (2) the $5.6 million

12   gain the bank realized in the sale-leaseback transaction; and (3) the decision of several directors

13   to relinquish certain retirement and insurance claims to the Bank in 2010.  The FDIC contests the

14   soundness of each of these defenses, but also advances a general argument, which the court

15   addresses first.

16   1.    Administrative Exhaustion under FIRREA

17        The FDIC argues that "any claim or action that asserts a right to assets of a failed

18   institution is subject to exhaustion" through an administrative claims process under FIRREA.

19   *McCarthy v. F.D.I.C.*, 348 F.3d 1075, 1077 (9th Cir. 2003) (citing 12 U.S.C. § 1821(d)(13)(D)[8]);

20   *see also Rundgren v. Washington Mut. Bank, FA*, 760 F.3d 1056, 1060–61 (9th Cir. 2014)

21   (describing the claims regime), *cert. denied*, 135 S. Ct. 1560 (2015).  This exhaustion requirement

22   is jurisdictional.  *See Rundgren*, 760 F.3d at 1060.

23

_____

24        [8] That section provides, "Except as otherwise provided in this subsection, no court shall
     have jurisdiction over—(i) any claim or action for payment from, or any action seeking a
25   determination of rights with respect to, the assets of any depository institution for which the
     Corporation has been appointed receiver, including assets which the Corporation may acquire
26   from itself as such receiver; or  (ii) any claim relating to any act or omission of such institution or
     the Corporation as receiver."  12 U.S.C. § 1821(d)(13)(D).  "The phrase 'except as otherwise
27   provided in this subsection' refers to a provision that allows jurisdiction after the administrative
     claims process has been completed."  *McCarthy*, 348 F.3d at 1078.
28

17

1          The statute is best understood by reviewing an example of its application.  In

2  *McCarthy v. F.D.I.C.*, the plaintiff sued the FDIC in its capacity as conservator of a failed bank

3  and argued he had been coerced into accepting unfavorable loan terms.  348 F.3d at 1077.  He

4  sought a declaration that the FDIC and the bank violated their fiduciary duties and caused him

5  damages.  *Id.*  He requested these damages be offset against his loan.  *Id.*  The Ninth Circuit held

6  that because he had not first exhausted his claims, the district court had rightly dismissed his

7  complaint for lack of jurisdiction.  *Id.* at 1081.  The court wrote in summary that FIRREA's

8  exhaustion requirement "applies to *any* claim or action respecting the assets of a failed institution

9  for which the FDIC is receiver."  *Id.* (emphasis in original).

10          Unlike "claims" or "actions," however, affirmative defenses need not first be

11  exhausted under § 1821.  *RTC v. Midwest Fed. Sav. Bank of Minot*, 36 F.3d 785, 793 (9th Cir.

12  1993); *Rundgren*, 760 F.3d at 1063.  For this reason, in *Midwest Federal Savings Bank*, the Ninth

13  Circuit held that although the defendant asserted an unexhausted "counterclaim," he in substance

14  asserted an affirmative defense for mutual mistake, not a "claim."  36 F.3d at 791–92.  Were the

15  opposite true, the court reasoned, defendants would be subjected to the "patently absurd

16  consequence" that they must file "as administrative claims all potential affirmative defenses

17  which might be asserted in response to unknown and unasserted claims by the [FDIC]."  *Id.*

18  (citation and quotation marks omitted).

19          The Ninth Circuit recently boiled these requirements down to two parts: the court

20  must ask (1) whether the litigant advances a "claim" and (2) whether the claim relates to any "act

21  or omission" of an institution for which the FDIC has been appointed receiver.  *Rundgren*,

22  760 F.3d at 1061.  If the answer to both questions is "yes," the court lacks jurisdiction over the

23  claim because the claimant has not exhausted FIRREA's administrative claims process.  *Id.*

24          Here, the parties' dispute concerns only whether the directors assert "claims" or

25  "affirmative defenses."  In this context, the definition of "claim" takes on its everyday meaning:

26  "a cause of action or the aggregate of facts that gives rise to a right to payment or an equitable

27  remedy."  *Id.*  The *Rundgren* court emphasized that under this definition, the word "claim" must

28  be understood broadly to bar review "'of any non-exhausted claim, monetary or nonmonetary,

1    which is susceptible of resolution through the claims procedure.'" *Id.* (quoting *Henderson v.*

2    *Bank of New England*, 986 F.2d 319, 321 (9th Cir. 1993)).  But a purported claimant's status as a

3    defendant is clearly a relevant factor; the *Rundgren* court distinguished *Midwest Federal Savings*

4    *Bank* on this basis.  *See id.* at 1063.

5            Here, as in *Midwest Federal Savings Bank* and unlike in *McCarthy* and *Rundgren*,

6    the directors cannot be said to assert "claims" against the Bank or FDIC.  As discussed in more

7    detail in the following paragraphs, the directors argue only that if they are to be taken to task for

8    approving the dividend transaction, they must be afforded an opportunity to argue the FDIC

9    would recover twice for the same wrong or that the Bank did not actually suffer the harm it

10   alleges.  *See* Opp'n at 4–10.  In short, if the directors' contentions are really "claims," it is hard to

11   imagine they could have advanced them before the FDIC filed this lawsuit.

12           The FDIC contends unpersuasively that because the directors could have sought

13   declaratory relief regarding their rights in this action, their defenses are "claims" and are barred.

14   The argument lacks an intelligible limiting principle.  Every legal position could in theory be

15   repackaged as a claim for declaratory relief, even the mutual-mistake defense considered by the

16   *Midwest Federal Savings Bank* court.  This court therefore has jurisdiction to consider the merits

17   of the directors' affirmative defenses.

18                   2.     June 2008 Payment from CVB to the Bank

19           As noted above, the directors cite evidence of three payments they argue, as a

20   matter of equity, must reduce their potential liability to the FDIC.  First, they cite evidence

21   showing that soon after the transaction was complete, the directors recognized the Bank's capital

22   ratio had fallen below its target value.  Coger Decl. ¶ 7, ECF No. 128-4.  They decided to address

23   this shortfall by arranging for CVB to borrow $4 million and transfer or "downstream" the

24   proceeds to the Bank.  *Id.*  They completed a transaction along these lines in late June 2008.  *See*

25   *id.* ¶¶ 7–8 & Ex. D.

26           The directors argue that if the FDIC's damages are not reduced by the amount of

27   the $4 million payment, it will recover twice for the same injury, because it acts as receiver for

28   the Bank.  In general, a plaintiff may not be compensated more than once for the same injury,

1    regardless of the number or type of legal theories in the case.  *Roby v. McKesson Corp.*, 47 Cal.

2    4th 686, 702 (2009).  For this reason, "if one tortfeasor pays partial compensation to the plaintiff,

3    the liability of other tortfeasors will be correspondingly reduced."  *Krusi v. Bear, Stearns & Co.*,

4    144 Cal. App. 3d 664, 673 (1983).  But payments from independent or "collateral" sources, for

5    example from the plaintiff's insurance policy, may not reduce a defendant's liability.  *See, e.g.*,

6    *id.* at 674.

7            To show that the June 2008 payment falls under the rule against double recovery,

8    the directors argue that under California Corporations Code section 506(a), CVB was liable to the

9    Bank as a recipient of the allegedly wrongful dividend, and that therefore it is a joint tortfeasor,

10   and the $4 million payment must be deducted from any damages the directors must pay as a

11   payment from a joint tortfeasor.  *See* Opp'n at 4–5.  The success of this argument depends on

12   CVB's liability under section 506(a).  That section provides, "Any shareholder who receives any

13   distribution prohibited by this chapter [Corporations Code sections 500 through 511] with

14   knowledge of facts indicating the impropriety thereof is liable to the corporation for the benefit of

15   all of the creditors or shareholders entitled to institute an action under [Corporations Code section

16   506(b)] . . . ."  Cal. Corp. Code § 506(a).  On this record the court cannot conclude the

17   distribution was prohibited by sections 500 through 511 of the Corporations Code, so section

18   506(a) cannot transform CVB into a joint tortfeasor, and its $4 million payment cannot reduce the

19   directors' liability.

20           Neither is it clear the defendants and CVB could accurately be described as "joint

21   tortfeasors" by virtue of section 506.  The natural reading of "joint tortfeasor" implies a liability

22   arising from the same wrong and the same injury.  *See, e.g.*, *May v. Miller*, 228 Cal. App. 3d 404,

23   409 (1991) (under California Code of Civil Procedure 877, two people are joint tortfeasors if

24   "there was one indivisible injury caused by two or more parties"); Black's Law Dictionary (10th

25   ed. 2014) (defining "joint tortfeasors" as "[t]wo or more tortfeasors who contributed to the

26   claimant's injury and who may be joined as defendants in the same lawsuit.").  The directors have

27   not demonstrated, for example, that the $4 million payment was meant to remedy the wrong they

28   are alleged to have committed; rather, as they describe it, the payment was targeted at the Bank's

1   capital ratio in general.  *Cf. Krusi*, 144 Cal. App. 3d at 673 (referring to "payments by one

2   tortfeasor on account of a harm for which he and another are each liable" (quotation marks and

3   citation omitted)).

4         In addition to section 506(a), the directors cite *Mueller v. MacBan*, 62 Cal. App.

5   3d 258 (1976), where the California Court of Appeal held that if a plaintiff challenges the

6   "dealings between the corporation and a director or a dominant or controlling stockholder, or

7   group of stockholders," it is the duty of the "director or holder to prove both the good faith of the

8   transaction and its inherent fairness from the viewpoint of the corporation and those interested

9   therein."  *Id.* at 277.  Although the directors do not spell out their logic expressly, it appears they

10  contend that a shareholder's duty to prove inherent fairness in a challenged transaction renders it

11  a joint tortfeasor.  The court disagrees.  The more straightforward reading of the language they

12  cite simply defines a burden of proof and allocates that burden to the defendant shareholder or

13  director, the person alleged to have acted against a corporation's interests.  The FDIC's motion is

14  granted in this respect.

15              3.    Gains in the Sale-Leaseback Transaction

16        The directors argue their liability must be reduced by gains the Bank realized in

17  the sale of the branch buildings, approximately $5.6 million.  *See, e.g.*, Robbins Decl. ¶¶ 3–5,

18  ECF No. 128-3.  In other words, they argue the FDIC misleadingly highlights only one leg of the

19  transaction, the $8.8 million dividend the Bank paid, and if damages are not reduced by the

20  $5.6 million, the FDIC will recover twice for the same wrong.  They point out that had the Bank

21  realized less than a $5.6 million gain in the sale-leaseback, the dividend paid to CVB would have

22  been smaller.  *See* Coger Decl. ¶ 3; Robbins Decl. ¶ 5.

23        This argument incorrectly equates, on the one hand, the "gains" that accrued to the

24  bank over time as the value of its physical branches appreciated, and on the other, "gains" to the

25  effect on the Bank's worth as a result of the sale-leaseback.  In the sale-leaseback, the Bank

26  exchanged its branch buildings for $15.3 million and promises to pay rent.  *See* Coger Decl.

27  ¶¶ 3-5 & Ex. A, at 7.  Clearly the Bank realized a "gain" when it sold the branch buildings for a

28  greater value than its bookkeeping reflected.  But exchanging real estate for cash did not make the

1    Bank wealthier.  From this perspective it is also clear why the size of the dividend depended on

2    the gain realized in the sale-leaseback.

3            The directors have therefore not shown that the entire $5.6 million must be

4    deducted from any damages they are made to pay.  That said, it remains to be seen whether the

5    directors can prove that exchanging real estate for cash added value to the Bank at large.  In other

6    words, this order does not preclude the defendants from arguing and proving at trial that the

7    Bank's newfound liquidity, or some other aspect of the transaction, caused the Bank's value to

8    increase.  The FDIC's motion is granted with this clarification.

9                    4.        Relinquishing Benefits and Insurance Plans

10           The directors cite evidence that in June 2010, many of them signed agreements

11   with the Bank voluntarily relinquishing their rights to salary continuation, deferred compensation,

12   and retirement benefits.  *See* Coger Decl. ¶ 4 & Ex. C, at 18.  According to CVB's Form 10-Q for

13   the quarter ending June 30, 2010, "[n]on-interest income of $6,333,000 was recognized as a result

14   of the derecognition of the retirement benefit liability."  *Id.* Ex. C, at 18.  The context of that

15   language does not reveal whether the Bank or CVB recognized the $6.3 million non-interest

16   income.  The 10-Q also reports that single-premium life insurance policies with cash surrender

17   values of about $11.7 million remained in effect, and the Bank continued as the beneficiary of

18   those policies.  *Id.*

19           The equitable doctrines of double recovery, offset, and unjust enrichment do not

20   apply to these payments.  First, it is unclear how allowing the FDIC to recover both these

21   payments and the damages it claims in this lawsuit would make for a double recovery.  The

22   directors have not produced evidence to show their relinquishment of these benefits was at all

23   connected to "the same items of damage" the FDIC's claims, as required before the doctrine

24   against double recovery may apply.  *Roby*, 47 Cal. 4th at 702.

25           Second, the equitable right of offset reduces a defendant's liability by the amount

26   of any mutual debt between the two, thus avoiding "'the absurdity of making A pay B when B

27   owes A.'"  *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston*

28   *Nat. Bank*, 229 U.S. 523, 528 (1913)); *accord Harrison v. Adams*, 20 Cal. 2d 646, 648 (1942)

1  ("[A] court of equity will compel a set-off when mutual demands are held under such

2  circumstances that one of them should be applied against the other and only the balance

3  recovered."). The offset must normally "rest on a claim enforceable in its own right." *R. M.*

4  *Sherman Co. v. W. R. Thomason, Inc.*, 191 Cal. App. 3d 559, 563 (1987). Here, the evidence

5  presented would not allow a trier of fact to find that the directors and the FDIC share a mutual

6  debt or have a claim "enforceable in its own right." Offset cannot apply.

7          Third, unjust enrichment is a separate "general principle underlying various legal

8  doctrines and remedies." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221,

9  231 (2014) (citations and quotation marks omitted). Stated simply, it allows the recovery of a

10  benefit unjustly retained. *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008). "A

11  critical limitation on this rule is that one who confers a benefit officiously is not entitled to

12  restitution. It must ordinarily appear that the benefits were conferred by mistake, fraud, coercion

13  or request; otherwise, though there is enrichment, it is not unjust." *Nibbi Bros., Inc. v. Home Fed.*

14  *Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415, 1422 (1988) (citation, quotation marks, and emphasis

15  omitted). Here, the directors have produced no evidence to show the Bank or FDIC retained the

16  retirement benefits unjustly, whether by mistake, fraud, coercion or request.

17          The FDIC's motion is granted as to the affirmative defenses of double recovery,

18  offset, and unjust enrichment.

19  VI.     <u>CONCLUSION</u>

20          The court recognizes the directors' withdrawal of their affirmative defenses for

21  failure to mitigate damages, contributory and comparative negligence, supervening causation,

22  estoppel, waiver, and laches. Summary judgment is GRANTED as to these defenses. The court

23  also recognizes the defendants' clarification that they did not intend their reservation of the right

24  to amend their answer as an affirmative defense, and DENIES the motion as MOOT with respect

25  to this defense.

26          The motion is GRANTED as to the affirmative defenses for failure to state a

27  claim, unclean hands, accord and satisfaction, release, offset, statutory preemption, unjust

28  enrichment, compliance with legal requirements, and waiver of rights;

1     The motion is DENIED as to the affirmative defense for legal incapacity; and

2     The motion is GRANTED IN PART AND DENIED IN PART with respect to the

3  affirmative defense of the statute of limitations, as described in this order.

4     This order resolves ECF No. 124.

5     IT IS SO ORDERED.

6  DATED:  May 26, 2016.

7

8                                        _____

9                                        UNITED STATES DISTRICT JUDGE

24